Filed 11/13/24  P. v. Hunt CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JERROLLYN RAYE HUNT,<br><br>Defendant and Appellant. | F085219<br><br>(Super. Ct. No. BF186900A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich and John W. Lua, Judges.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ivan P. Marrs and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In August 2021, defendant Jerrollyn Raye Hunt was arrested and charged with the shooting death of Javontae Green. In September 2022, the jury rejected the charge of willful, deliberate and premeditated murder, but convicted defendant of second degree murder with a firearm enhancement. (Pen. Code, §§ 187, subd. (a), 189, subd. (b), 190, subd. (a), 12022.53, subd. (d).)[1] Defendant was subsequently sentenced to 15 years to life for murder with a consecutive term of 25 years to life for the firearm enhancement. She timely appealed.

On appeal, defendant claims that her conviction for second degree murder is not supported by substantial evidence of malice aforethought, which entitles her, as a matter of law, to either reversal of the conviction based on self-defense or reduction of the conviction to voluntary manslaughter based on imperfect self-defense or heat of passion. She also claims that during supplemental closing argument, which was intended to clarify the issues of sudden quarrel and heat of passion, the prosecutor misstated the law concerning provocation, resulting in prejudicial error. Anticipating the issue of forfeiture, defendant claims that if her claim was not preserved for review, defense counsel rendered ineffective assistance of counsel (IAC).

The People take the position that substantial evidence supports defendant's conviction for second degree murder; she forfeited her claim of prosecutorial misconduct by failing to make an assignment of misconduct and request an admonition; and on the merits, there was no prosecutorial error but if error is assumed, it was not prejudicial.

We conclude that defendant's second degree murder conviction is supported by substantial evidence, she forfeited her claim of prosecutorial misconduct by failing to request the jury be admonished, and defense counsel's failure to seek an admonition did not constitute IAC. Therefore, we affirm the judgment.

---

[1]     All further statutory references are to the Penal Code.

2.

# FACTUAL SUMMARY

## I. Shooting

Defendant's 23-year old daughter, J.B., and Green, 30 years old, had been in a relationship for approximately two years and they lived together at his sister's house. Their relationship was serious and J.B. considered Green to be her spouse. They were having some issues at the time and arguing, but Green was never physically abusive toward J.B. The day before he was killed, Green told J.B. to leave his sister's house, so she went to stay with defendant.

J.B. learned that after she left that day, Green had gone to the apartment of K.Q., with whom he had two children. J.B. decided she wanted the spare key to her car back from Green. She discussed the matter with defendant and her younger sister, J.S. S., who was 17 years old. The morning of the shooting, J.B. called Green and K.Q. numerous times. Green did not answer her calls, but she spoke to K.Q. several times that morning.

At around 10:30 a.m., J.B. drove to K.Q.'s two-building apartment complex on Eye Street and parked her gray Malibu across the street. Defendant and J.S. followed in defendant's white Mustang and parked behind J.B. J.B. got out and, as seen in part on surveillance camera footage, went alone around the back of the second building to check the parking lot for K.Q.'s car.[2] After seeing it, she returned to her car and let defendant know Green and K.Q. were home. Just under 10 minutes later, the camera captured the sound of J.B. honking her car horn from the street. Approximately 15 minutes after that,

---

[2] The apartment complex consisted of two buildings, separated by a walkway. The first building faced Eye Street, where the shooting occurred, and the second building was directly behind the first, with a walkway between the two. Jurors saw a resident's surveillance camera footage, which captured a small portion of the complex's driveway and the walkway between the two buildings. K.Q. lived in the second building and although her apartment door was out of camera range, it was close enough that the camera recorded some of the activity that preceded the shooting, including the involved parties, the sounds of knocking and arguing, and the sound of K.Q.'s apartment window being broken. It also captured the sound of Green breaking J.B.'s car window and the gunshot that killed him,

3.

while J.B. waited in her car, defendant, J.S., and defendant's friend, L.D., who had arrived in a black SUV, approached K.Q.'s apartment. While defendant and J.S. waited around the corner of the building, L.D. knocked on the apartment door. Defendant and J.S. then approached the door and defendant repeatedly asked for the keys. Words were exchanged and the group left several minutes later.

The group drove to a nearby convenience store and then back to the apartment complex. About 10 minutes after they first left, defendant and L.D. walked back to K.Q.'s door, followed shortly thereafter by J.S. and then J.B. During loud arguing, the surveillance camera recorded a bang that J.B. testified was the window breaking after J.S. hit it. Defendant and J.S. hurried away. J.B. followed shortly behind them, with Green following her. Approximately one minute later, two bangs could be heard, and Green said something to the effect of, "Yeah, yeah, take that." Approximately six seconds later, there was one gunshot followed by J.B. screaming several times, "Mama, what did you do?" K.Q. then started screaming and called for an ambulance.

Green died at the scene from one gunshot to his lower forehead.

## II. Eyewitness Testimony

### A. J.B.

After J.B. found out Green had gone to K.Q.'s apartment the night before, she talked with defendant and J.S. about getting her car keys back and asked defendant to go with her, but she testified she was not looking for a fight. She knew one of Green's and K.Q.'s children had a birthday that day and she did not want to ruin things. When they arrived, she stayed in the car because she and K.Q. "had [their] differences" and it would not be a good idea for her to go to the door. She testified she did not know defendant's friend, L.D., was going to show up and she did not want L.D. there. J.B. described L.D. as "really rowdy" that day, which was consistent with her personality, and J.B. said L.D. riled defendant up.

4.

After defendant and L.D. knocked on the door and no one answered, J.B. followed defendant, J.S., and L.D. to the nearby convenience store. They all talked about getting J.B.'s keys back, but J.B. told them they would get the keys another day because it was Green's child's birthday and she wanted to let it be. Defendant told J.B. to take J.S. home. J.B. later told police that defendant was "hell bent on going back" to get the keys. J.B. testified that she did not want defendant going back to the apartment and she called K.Q. to ask if Green was there. K.Q. said no and J.B. called defendant to tell her, but she did not answer so J.B. drove back to the complex.

J.B. parked across the street from the complex again, in front of defendant's car. L.D. was parked behind defendant's car. J.B. could hear defendant, L.D., and K.Q. yelling so she and J.S. got out of the car and walked to the door. J.S. reached the door first and also started yelling. When J.B. arrived, K.Q. was near her upstairs window. J.B. told everyone to stop fighting, she just wanted her keys, and she did not want any problems. J.B. could see K.Q.'s hands in the window and then she saw Green's hands and shirt through the blinds as the window started slowly closing. J.S. spotted Green, too, and, angered, hit the downstairs window, which broke.

Green ran down the stairs and out the front door. J.B. testified he was really angry and was looking right at her, yelling, "[Y]ou did it, you did that." J.B. ran to her car, got in, and locked the doors. Green tried to open the driver's door and then hit the rear passenger window on the driver's side three times with his elbow, trying to break it but without success. J.B. tried to drive off, but defendant was standing in front of her car so she was unable to leave.

J.B. then saw L.D. with a piece of wood that looked like a two-by-four.[3] L.D. went toward Green and tried to hit him with it. Before grabbing the wood and pulling it

---

[3] There were two pieces of splintered wood at the scene, painted or stained white and described by law enforcement as approximately one-by-four inches and 15 feet in length, consistent with baseboard or another interior trim piece.

out of L.D.'s hands, Green said, "I have to beat her ass, too?" L.D. then ran away and Green swung the wood like a baseball bat, hitting J.B.'s rear window twice and breaking it. J.B. had ducked down to avoid being hit with glass and she heard one gunshot. She sat back up and saw Green on the ground.

J.B. approached Green and saw that he had been shot in the head. J.B. cried, "[M]ama, what did you do?" She saw defendant and J.S. run away, and after apologizing to K.Q., she drove off in the opposite direction. J.B. testified that defendant owned a small, pink gun she kept hidden, but J.B. was not aware defendant brought a gun with her and there was no discussion about bringing a gun.

**B.     K.Q.**

K.Q. and Green shared two children, then eight and five years old. K.Q. and Green had an on-and-off again relationship and, in August 2021, she was aware Green and J.B. had broken up. The day before Green was killed, K.Q. picked their children up from his sister's house, where he lived, and they agreed he would come over to her apartment because one of their children had a birthday the next day.

Around 10:30 a.m. the next morning, K.Q. received an incoming call on her cell phone from a private number. She answered but hung up when she realized the caller was J.B. K.Q. answered a second call and told J.B. she did not want to deal with any issues on her child's birthday. Incoming calls to her phone continued, but she only answered the first two calls. K.Q. then received a text that said, "I'm outside. Tell JT to bring my keys."[4] K.Q. showed the text to Green and did not initially respond, but someone started knocking on her door. Although she texted back that Green was not there, the knocking persisted.

K.Q. and Green were in the living room and K.Q. wanted to answer the front door, but Green directed her not to. The pounding on her door continued so she went upstairs

---

**4**      JT was Green's nickname.

6.

to her bedroom window overlooking the walkway and front door, and spoke with J.B. through the open window, with the curtains closed but behind her back so she was visible but the view into the room was blocked. As she was asking the group to leave and saying the situation had nothing to do with her, Green reached around to close the window and J.S. saw him. She said, "[T]here he is," and punched the downstairs window, breaking it. J.B. and defendant were standing near J.S., and when the window broke, defendant and J.S. ran. Green ran downstairs and K.Q. heard J.B. say, "I didn't do it" before J.B. also ran.

K.Q. described Green as upset because the window was broken and he said something to the effect of, "[Y]ou guys came to my kids' mom's house with this bullshit." After grabbing her can of mace and making sure the kids were still asleep, K.Q. went outside. She was talking to Green's sister on the phone and when she reached her mailbox, she saw defendant with a gun. She did not see Green. She turned around to make sure she had closed her front door and heard a gunshot. After running to make sure her door was closed, she ran to the street and saw Green on the ground. K.Q. saw J.B. and it appeared J.B. was going toward Green as if to help him, but J.B. then turned around, got in a gray Malibu, and left.

K.Q. did not see what happened in front of the apartment complex except for defendant pointing a gun. She did not see anyone with a white board; she did not see Green struggling with anyone; and she did not see, and did not recall hearing, arguing and more glass breaking.

C.    **Neighbors**

D.R., whose surveillance camera captured the footage shown to the jury, lived two doors down from K.Q. She testified that she awoke to arguing and heard three voices, one of which belonged to her neighbor. She stayed inside and was not able to hear what was being said, but she provided her surveillance camera footage to police.

S.C. lived in the first building, across the walkway from K.Q., and her living room window looked out onto Eye Street. She testified that she tried to forget the event that day because it caused her anxiety and she only remembered parts of what happened. She recalled seeing an older black Chevrolet Tahoe arrive and then she heard women arguing behind her apartment. She also saw people coming from the side of the complex to Eye Street, and one woman was wearing red leggings and had a pole.[5] She did not remember how many women were there, but there were more than two. Although she was not sure who had the pole first, she testified that a man and a woman struggled over the pole and the man ended up with it.[6] She did not see the man hit anyone with the pole. However, she testified the man was hit with the pole and after he took it away from the woman, he hit a gray car with it and broke out the rear window.

S.C. saw a different woman than the one in red open the driver's side of a white Mustang and crouch down like she was getting something. The woman then pulled a gun and pointed it at the man, who was trying to walk away from the women. She also described the man as walking in the woman's direction, but at a distance. She did not see anything else after the woman pointed the gun because she gathered her children and crouched down. She called 911 after she heard a gunshot and the woman who lived behind her screaming.

### D. Passerby

S.A. was stopped at a light on southbound Eye Street when, down the street in front of her, she saw three women "going after" a gray car and one woman was hitting it with a wood two-by-four. The car was trying to move and was sideways on the street.

---

[5] L.D. was wearing a red outfit.

[6] S.C. described the man as a "kid," but she explained the term included young people and the person was over the age 18 years old and not a child. There is no dispute that the individual she saw on the street was Green and, therefore, we refer to him as a man when summarizing her testimony.

She saw the driver's side of the car, but did not see who was inside. She testified the women appeared to be running after the car and trying to block it as it tried to move. She could tell the women were yelling and they seemed angry, but she could not hear what they were saying. She turned the corner to avoid that block of Eye Street and when she turned back onto Eye Street now going northbound, she saw the three women get into a dark SUV and flee northbound on Eye Street.

S.A. did not hear a gunshot or see a man, and she did not see the gray car leave. She estimated the women were approximately 29 feet away from her when she first saw them running toward the car and when they reached the car, they were approximately 58 feet away from her.

## III.    Jail Calls

Defendant was located at her residence on the night of the shooting and subsequently arrested. The prosecution introduced evidence of 10 phone calls defendant made from jail, one of which was made from another inmate's account. In August 2021, defendant called her niece and had her arrange a three-way call with defendant's boyfriend. In the call, defendant asked her boyfriend if he knew "how people walk in front of stuff," and when he said "[y]es," she told him "[t]hat's what happened." She later said, "After, after the stick was thrown, just somebody walked in front of something. [¶] … [¶] … away somewhere else. [¶] … [¶] … And they just walked off and walked right in front of it." She also asked him to see if he "can get the guy who was there with the dreadlocks that said what he said, see what he's got to say," whom she thought was "Jessie's homeboy," and reiterated, "He walked right in front of it their self."

In the second call, which was to her nephew, defendant mentioned someone was not telling the truth and was scared into saying some things. She then said, "[W]hen you walk in front of something, that's what happened," and "When people think they macho and walking right in front of something." "So, he was over there trying to do too much, trying to do too much, over there trying to kill everybody in that motherfucker over

9.

there."  Defendant asked her nephew if he had seen all the stitches in J.S.'s arm, and said "he" tried to attack L.D., J.B., and her.  Defendant also again said "I believe that they walked right in front of it.  That's why."

In a phone call to another individual in November 2021, defendant told him to "always keep a strap," but you have "to be smart with it."  She also said, "If you gonna pull something, you better use that motherfucker is what they always taught me."  "That's why I'm sitting up in this motherfucker right now."

In April 2022, defendant called J.S. and said she was going to call right back. Minutes later, defendant called from another inmate's account and told J.S. her story needed to stay the same, adding nothing and leaving nothing out.  Defendant also told J.S. she did not see anything because she was busy and her back was to defendant.  In discussing future testimony, defendant told J.S., "And I'm like you know what, she was only 17.  First of all she was losin' half her damn blood.  First of all she was sick, first of all-  [¶] … [¶]  I was on my way to take her to the hospital from the beginning.  Okay? [¶] … [¶]  So, I don't wanna hear none of that.  She was already sick, and now she's losin' more blood than he was losin', actually."  J.S. replied, "Right.  I was sick to the whole beginning," and "My whole arm was bleedin'."[7]

## DISCUSSION

### I.  Substantial Evidence Claim

Defendant claims entitlement to either reversal of her second degree murder conviction or a reduction to voluntary manslaughter "because no rational juror could have found proof beyond a reasonable doubt that [she] was not acting in defense of others, or that she was not acting in the heat of passion upon adequate provocation, or that she

---

[7]     There was a trail of blood drops at the scene beginning at K.Q.'s apartment and going up Eye Street, and there was some blood in and on defendant's Mustang.  At the police station, J.S.'s right arm was bandaged and photographed, but the detective did not ask her to remove the bandage.  J.B. did not see any blood on J.S.'s arm when she hit the window, but she saw "a lot of blood on" it when J.S. and defendant ran after the shooting.

objectively but unreasonably believed that she needed to exercise defense of her daughter against Mr. Green." As discussed next, there were disputed issues of fact in this case, but viewed in the light most favorable to the prosecution, substantial evidence supports defendant's conviction for second degree murder.

## A. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....'" (*Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

### B. Legal Principles

#### 1. Murder and Manslaughter

"Murder is defined as 'the unlawful killing of a human being … with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192). Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' [Citation.] Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" (§ 188), or with awareness of the danger and a conscious disregard for life.' [Citation.]

"'Generally, the intent to unlawfully kill constitutes malice.' [Citation.] However, California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]: (1) when a person kills ""in a "sudden quarrel or heat of passion" [citation], or … [(2) when a person] kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].""' [Citation.] 'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide [citation]."""' (*People v. Schuller* (2023) 15 Cal.5th 237, 252, fn. omitted (*Schuller*).)

"While 'closely resembl[ing] an affirmative defense' [citation], imperfect self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter … is not a defense but a crime .…'" (*Schuller, supra*, 15 Cal.5th at p. 253.) "[W]hen provocation or imperfect self-defense are at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt." (*Id.* at p. 254.) "Stated more simply, because malice is absent when [provocation or] imperfect self-defense is present, the prosecution cannot

prove malice without disproving [provocation or] imperfect self-defense." (*Id.* at pp. 254–255, fn. omitted.)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] "'To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] [¶] To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.""" (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)

### 2. Perfect Self-defense

Perfect self-defense, in contrast, "'is a complete justification, and such a killing is not a crime.'" (*People v. Soto* (2018) 4 Cal.5th 968, 974, quoting *People v. Elmore* (2014) 59 Cal.4th 121, 133–134.) "Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself [or another] from imminent danger of death or great bodily injury.' [Citations.] 'To satisfy the imminence requirement, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of

13.

*imminent* danger to life or great bodily injury.'" [Citation.] "'"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*.'"'" (*People v. Thomas* (2023) 14 Cal.5th 327, 386.) "As a matter of constitutional due process, the defendant need only raise a reasonable doubt regarding a defense that negates an element of the crime, and in this situation the burden of persuasion is on the People to show the nonexistence of the defense beyond a reasonable doubt." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570.)

### C.    Analysis

Defendant argues that her conviction must be reversed because no rational juror could have concluded that she did not act in defense of J.B. (See *Nguyen, supra*, 61 Cal.4th at p. 1044 ["'"'[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine.'"'"].) Alternatively, she argues that even if we find there is substantial evidence to support the jury's rejection of her claim of an actual, *reasonable* need to defend J.B., there is not substantial evidence supporting the jury's rejection of her claim either of an actual but *unreasonable* belief in the need to defend J.B. or that she acted in the heat of passion.

We do not find defendant's argument meritorious. This is not a case where the relevant facts were undisputed (*Nguyen, supra*, 61 Cal.4th at p. 1044), and it was for the jury to determine whether to credit testimony in whole, in part, or not at all (*In re Lopez* (2023) 14 Cal.5th 562, 591 ["It is well settled that the jury has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit."]). Therefore, our inquiry is necessarily limited: "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient

14.

substantial evidence to support"' the jury's verdict." (*Zamudio, supra*, 43 Cal.4th at p. 357.)

Although the argument at K.Q.'s door and the events on the street, including the shooting, were not visible on the surveillance camera footage, jurors saw the group going to and coming from K.Q.'s apartment, and they heard the arguments and the fatal gunshot. Consistent with J.B.'s description, defendant and L.D. were loud and confrontational that day. Minutes before the shooting, defendant and L.D. returned to K.Q.'s door, followed shortly thereafter by J.S. and J.B. There was a lot of angry yelling and some profanity, and L.D. walked into and then out of camera range, in the direction of the parking lot behind K.Q.'s building. After the sound of the window breaking, J.S. ran toward the street with defendant walking quickly behind her. J.B. then ran toward the street shortly thereafter with Green behind her walking at a fast pace, with nothing in his hands.

J.B. testified she got into her car and locked the doors. Green initially tried the driver's door and hit the passenger window on the driver's side with his elbow, but it did not break. J.B. had started her car and it rolled forward a little, but she was unable to drive off because defendant was standing in front of her car blocking her exit path. After L.D. struck Green with a piece of wood, he grabbed it out of her hands and, using it like a bat, hit J.B.'s rear window two times, shattering it. Audible on the surveillance footage, he said something to the effect of, "Yeah, yeah, take that," and then the gunshot is heard approximately six seconds later.

Following defendant's arrest, she made repeated statements in jail calls indicating that Green was shot when he walked in front of the gun. In one of those conversations, she stated that this occurred after the piece of wood was thrown and as Green was walking away. Although defendant stated Green tried "to kill everybody" and "tried to attack" them, those vague statements lacked force given her repeated assertions that he

15.

walked in front of the gun and the absence of any expressed belief that J.B. was in danger.

J.B. testified Green had an unfriendly smile on his face and she "was kind of scared," but she did not view it as a threat, and she testified that Green was never physical with her and she never told anyone that he was verbally or physically abusive. When subsequently asked if she feared for her safety, she said, "I mean, a little, yes. I guess you could say that," but she did not testify that she believed her life was in danger or that Green was going to harm her. Further, Green was shot seconds after breaking the rear window, which jurors could hear on the surveillance video, and after defendant said he had tossed the piece of wood and was turning to walk away. S.C. also testified that the man was walking away from the women when the gun was pointed at him. Defendant then fled after shooting Green, and she later made statements in jail calls from which jurors could infer she was attempting to create false evidence or solicit false testimony. This included a call to J.S. from another inmate's account, during which defendant said she was calling from that account because her phone calls were being monitored. During that call, she also led J.S. in a conversation from which the jury could readily infer defendant was coaching J.S. on how to testify and what to say.

From the evidence in this case, a rational trier of fact could conclude that Green was understandably angered because the group showed up at K.Q.'s apartment on his child's birthday, exchanged heated words with K.Q., and then broke her living room window. As seen and heard on the surveillance camera footage, as Green followed J.B. toward the street, he said something to the effect of, "You want to do that shit, huh?" and mentioned "his kids." After Green reached J.B.'s car, L.D. hit him with a board. He grabbed it out of her hands and broke out the rear window of J.B.'s car, which the jury could infer was payback for breaking K.Q.'s window. Given that Green broke the rear window rather than returning to the driver's window or the windshield, and he was heard on the surveillance footage saying, "Yeah, yeah, take that" after hitting the window, a

16.

reasonable trier of fact could have determined that Green, whom J.B. testified was not abusive and was treated like a son by defendant, did not present any threat to J.B. and intended only to damage her car. Further, it was defendant who prevented J.B. from simply driving away by blocking the path of her car, and instead of later expressing fear that J.B. was in imminent danger of death or great bodily injury, defendant repeatedly said Green walked in front of the gun. She also said she was taught that if she was going to pull something, she had better use it, which is what happened.

Thus, supported by a soundtrack of the events, a rational trier of fact could conclude that defendant neither reasonably nor unreasonably believed J.B. was in imminent danger of death or great bodily injury. Further, a rational trier of fact could conclude that Green's act of breaking the rear window on J.B.'s car while she was in the driver's seat, after the group broke K.Q.'s living room window and after L.D. hit him with a board, was *not* sufficiently provocative to "'cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection. [Citations.]'" (*People v. Moye, supra*, 47 Cal.4th at p. 550.) Similarly, a rational jury could conclude that defendant did not shoot Green while "under 'the actual influence of a strong passion' induced by such provocation." (*Ibid.*)

"'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence'" (*Zamudio, supra*, 43 Cal.4th at p. 357), and, as previously stated, "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*ibid.*). "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id.* at p. 358.) In this case, the facts were not undisputed (*Nguyen, supra*, 61 Cal.4th at p. 1044), and there was evidence from which the jury could find that the prosecutor proved, beyond a reasonable doubt, that defendant acted with malice and that she did not act in perfect or imperfect

17.

defense of J.B., or in the heat of passion. Therefore, we reject defendant's substantial evidence challenge to her second degree murder conviction.

## II.     Prosecutorial Misconduct Claim

### A.     Procedural Background

The jury in this case sent numerous notes. Within approximately 90 minutes of initiating deliberations, the jury requested readback of J.B.'s testimony from the point she ran to her car after J.S. broke the window to the shot being fired. Approximately four hours after readback was completed the next morning, the jury requested readback of S.C.'s testimony from the point she described people in the street.

The following day in the afternoon, the jury requested clarification of the following sentence from CALCRIM No. 570: "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation, as I have defined it." The jury asked if the provocation that influenced defendant had to be "'direct' towar[d]s only the defendant or can it apply to others?" Approximately 20 minutes prior to adjourning for the day, the court responded in writing, "The defendant must have acted under the direct and immediate influence of provocation, but the provocation can come from what she is/was directly observing. The act or conduct observed by the defendant does not have to be directed towards the defendant."

The next morning, after approximately 30 minutes of deliberating, the jury sent a note informing the court it had reached a verdict on one count, but could not agree on the next count.[8] The trial court asked jurors if any of the following would be of assistance: additional readback, clarification of the law or additional instructions, review of the exhibits, or additional comments by the attorneys on the evidence or the law. No juror thought additional readback would be of assistance, but one juror thought further

---

[8]     The court noted jurors had been deliberating for approximately 13 to 14 hours.

18.

instruction might be of assistance, three jurors thought exhibit review might be of assistance, and eight jurors thought additional argument by the attorneys might be of assistance.

Thereafter, the jury sent three notes requesting clarification or argument on heat of passion and sudden quarrel, one of which also requested the attorneys or the judge address "acted *willfully*" and "acted *deliberately*" as set forth in CALCRIM No. 521. A fourth note requested further explanation of the three factors required to find defendant killed because of sudden quarrel or in the heat of passion, and the relevant timeframe for direct and immediate provocation. The note expressly excluded clarification on imperfect self-defense, and also asked what to "do if someone is basing their choice on emotion and outside factors and not based on evidence." Finally, the jury asked if jurors should ignore the lesser counts if unable to agree on a count.

The trial court provided the following responses in writing:

"1.    You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder, and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder. Please see CALCRIM [No.] 640 for further clarification.

"2.    The attorneys will have an opportunity to discuss voluntary manslaughter with you. As for definitions of words, some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases have been specifically defined in these instructions. Please be sure to listen carefully and follow definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings. Please see CALCRIM [No.] 200 for further clarification.

"3.    You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial. You must not let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision. Many people have assumptions and biases about or

19.

stereotypes of other people and may be unaware of them. You must not be biased in favor of or against any party, witness, attorney, defendant, or alleged victim because of his or her disability, gender, nationality, national origin, race or ethnicity, religion, gender identity or sexual orientation. Please see CALCRIM [No.] 200 for further clarification.

"4. The attorneys will have the opportunity to discuss heat of passion and sudden quarrel (CALCRIM [No.] 570). As for 'acted willfully' and 'acted deliberately,' please see CALCRIM [No.] 521. The defendant acted *willfully* if she intended to kill. The defendant acted *deliberately* if she carefully weighed the considerations for and against her choice, and, knowing the consequences, decided to kill.

"5. You are also being provided an instruction about provocation to review. Please see CALCRIM [No.] 522 attached to this note for consideration."[9]

Defense counsel and the prosecutor then provided further comments and argument to the jury. On appeal, defendant argues that during supplemental argument, the prosecutor misstated the law with respect to manslaughter and that the misconduct was prejudicial. (Citing *People v. Beltran* (2013) 56 Cal.4th 935, 948–949 (*Beltran*).) The portion of supplemental argument at issue occurred at the end of the prosecutor's remarks, as follows:

"[PROSECUTOR:] So sudden quarrel or heat of passion says you are under the influence of intention [*sic*] emotion as to reasoning. *A person of average disposition would have responded this way.*

"[DEFENSE COUNSEL]: Objection. Misstates the law, as to this way.

"THE COURT: The objection is sustained. You can rephrase your comment.

---

[9] CALCRIM No. 522, the pattern instruction for "Provocation: Effect on Degree of Murder," provides, "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

20.

"[PROSECUTOR]: Sure. [¶] It is not enough to simply be provoked. The defendant cannot set up her own standard of conduct because we are looking at an average disposition, we are not looking at the defendant herself. We are looking at a reasonable person, your average person. [¶] And that heat of passion, it does not require anger or rage. It can be any violent, intense, high wrought emotion. So what we are looking at, we are looking at an intense emotional reaction that obscures sound judgment and reason. [¶] … [¶] … *You would have to believe that an ordinary person in this situation would have acted from passion, not judgment, and now looking at the defendant's conduct, it would justify her killing Javontae.* [¶] *That is what that jury instruction means.*

"[DEFENSE COUNSEL]: I would ask that the PowerPoint that has the incorrect portion of the law be taken down. It's been up for a while now. Line three, person of average disposition would have responded this way is an incorrect statement of law. Objection.

"THE COURT: That objection is sustained.

"[PROSECUTOR]: And as I indicated, let me correct that. When I say this way, I am talking about acting from passion, not judgment. That is what I mean. Would have responded this way out of passion, not judgment. [¶] If I didn't make that clear, I hope I'm making it clear now. [¶] So for sudden or heat of passion to apply here in this case, when you are looking at the evidence, you are saying let's—now we are judging the defendant's conduct that day, does manslaughter instruction apply? [¶] *What you have to look at is you would have to believe an ordinary person would have acted from passion, not judgment, and therefore, that would justify the defendant's conduct that day of killing Javontae.*

"[DEFENSE COUNSEL]: Objection. Slightly conflates legal theory.

"THE COURT: Overruled." (Italics added.)

The prosecutor finished his supplemental argument shortly thereafter and the jury returned to deliberating. Approximately one hour later, the jury returned its verdicts.

Defendant argues that the prosecutor misstated the law with respect to provocation and that the misconduct rose to the level of a due process violation, entitling him to reversal whether the error is measured under *Chapman v. California* (1967) 386 U.S. 18

21.

or *People v. Watson* (1956) 46 Cal.2d 818.  Anticipating the issue of forfeiture, defendant also argues that further objection or argument would have been futile, and defense counsel rendered IAC.  For the reasons discussed next, we conclude that defendant did not preserve her claim of prosecutorial misconduct and that defense counsel's failure to request the jury be admonished did not constitute deficient performance.

### B.    Legal Principles

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 401, quoting *People v. Morales* (2001) 25 Cal.4th 34, 44.)  "'To establish misconduct, defendant need not show that the prosecutor acted in bad faith.  [Citation.]'  [Citation.]  However, '[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*People v. Bell* (2019) 7 Cal.5th 70, 111.)  "'[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used "'deceptive or reprehensible methods'" and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted.'" (*People v. Navarro* (2021) 12 Cal.5th 285, 332, quoting *People v. Caro* (2019) 7 Cal.5th 463, 510.)

"'A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made "a timely and specific objection at trial" *and* requested an admonition.'" (*People v. Potts* (2019) 6 Cal.5th 1012, 1035, italics added, quoting *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853 (*Daveggio*); accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)  "Consistent with that purpose, '[a] court will excuse a

defendant's failure to object only if an objection would have been futile' [citation], or if an admonition would not have mitigated the harm caused by the misconduct [citations]." (*Daveggio, supra*, at p. 853, quoting & citing *People v. Jackson* (2016) 1 Cal.5th 269, 349.)

### C.    Analysis

#### 1.    Claim Forfeited

Relevant to defendant's claim of error, in *Beltran*, the California Supreme Court rejected the People's argument "that adequate provocation for voluntary manslaughter requires a finding that an ordinary person of average disposition would *kill* …." (*Beltran, supra*, 56 Cal.4th at p. 949.)  The court stated, "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing.  The proper focus is placed on the defendant's state of mind, not on his particular act.  To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Ibid.*)  "[P]rovocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Ibid.*)

Here, the jury was instructed that defendant killed Green because of a sudden quarrel or in the heat of passion if she "was provoked," "as a result of the provocation, [she] acted rashly and under the influence of intense emotion that obscured her reasoning or judgment," and "the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment." Relying on *Beltran*, defendant's claims that the prosecutor misstated the law by leading the jury to focus on whether a person of average disposition would act to kill. (*Beltran, supra*, 56 Cal.4th at p. 949.)  However, while defense counsel objected to the prosecutor's arguments, counsel did not request any admonitions.

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court.  [Citation.]'  [Citations.]  Strong policy reasons support this rule:  'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.  [Citations.]'  [Citation.]  """"The law casts upon the party the duty of looking after h[er] legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to h[er] objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.""""  (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

As stated, requiring an objection *and* a request for an admonition allows the trial court """"to correct any error and mitigate any prejudice.""""  (*Daveggio, supra*, 4 Cal.5th at p. 853, quoting *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.)  "'[A] court will excuse a defendant's failure to object only if an objection would have been futile' [citation], or if an admonition would not have mitigated the harm caused by the misconduct [citations].  '"[T]he absence of a request for a curative admonition"' may likewise be excused if '""the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.""'  [Citation.]  'A defendant claiming that one of these exceptions applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough.'"  (*Daveggio, supra*, at p. 853; accord, *People v. Nadey* (2024) 16 Cal.5th 102, 185.)

Defendant argues that because the trial court overruled her final objection, "any further argument and objection from defense counsel would have been futile."  However, defendant's bare assertion that further argument or objection would have been futile is unsupported by the record.  There is no indication the trial judge was intemperate in

general or with defense counsel in particular, and, critically, there is no indication the judge would have refused a request for an admonition. To the contrary, during supplemental argument, the trial court admonished the jury repeatedly that it was the factfinder in response to defense counsel's earlier objections to alleged misstatements of the facts or evidence. Further, after the prosecutor finished his supplemental argument and the jury left the courtroom, the court asked if either party had anything to put on the record. Both parties responded in the negative and we find the record devoid of any support for defendant's conclusory argument that further objection or the request for an admonition would have been futile.

"'[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, fn. 7.) The circumstances in this case do not present occasion to depart from this general principle. Therefore, given the absence of any request for an admonition, we find defendant's claim of prosecutorial error forfeited.

### 2. Counsel Not Ineffective

Anticipating the possibility of forfeiture, defendant argues that defense counsel rendered IAC. However, to prevail on a constitutional claim of IAC, a defendant "'must satisfy a two-pronged showing: that counsel's performance was deficient, and that [she] was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736 (*Woodruff*), quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "'[T]he standard for judging counsel's representation is a most deferential one.' (*Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Richter*).) We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' (*Bell v. Cone* (2002) 535 U.S. 685, 702.)

25.

'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.' (*Richter*, at p. 105.)" (*In re Long* (2020) 10 Cal.5th 764, 773.)

Therefore, a "defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on [IAC] on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.) "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Strickland, supra*, 466 U.S. at p. 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105.)

As discussed, although defense counsel objected, she did not request any admonition, and nothing in this record suggests the failure to do so was deficient. We must presume counsel is competent and, therefore, that she would have requested an admonition had she believed one was necessary in light of the prosecutor's comments. At most, several of the prosecutor's sentences were arguably slightly imprecise when he referred to acting or responding, but considered in context, it was clear he was arguing whether a person of average disposition would have acted from passion rather than judgment and he did not argue the jury was to consider whether a person of average disposition would act to kill.[10] (*Beltran, supra*, 56 Cal.4th at p. 949.) Further, the jury was correctly instructed with CALCRIM No. 570, the pattern instruction for manslaughter: heat of passion; the jury had the written jury instructions during

---

[10]    In *Forrest*, for example, although the appellate court concluded there was no prejudice, it found misconduct where the prosecutor argued, in part, "'*What would a reasonable person do*? Would a reasonable person leave? Kick her out? Cover her mouth? Get her attention? Fire a warning shot?  [¶]  *Or grab a loaded gun, rack it, walk up behind her, aim at her head and pull the trigger*?  [¶]  *You have to find that this is what a reasonable person would do* to find manslaughter in this case, based on his statement alone.'" (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1084.)

deliberations; the portion of the prosecutor's supplemental argument at issue comprised only a small fraction of the prosecutor's overall argument; and the asserted transgression was minor.[11] (See *People v. Fayed* (2020) 9 Cal.5th 147, 192 ["We presume the jury followed the trial court's instruction absent evidence to the contrary."].)

Moreover, although the jury was at an impasse of sorts prior to supplemental argument and sought clarification on heat of passion, nothing in the notes suggests an issue that would have been affected by the prosecutor's minor comments. The jury notified the court it reached a verdict on one count, but could not agree on the next count less than one hour after the court answered its question concerning whether the provocation had to be directed at defendant or could be directed at someone else. The jury thereafter sought clarification on heat of passion, but its most specific note sought clarification on timeframe in the context of provocation and what to do if someone based their opinion on emotion and outside factors rather than the evidence, neither of which lends support to defendant's argument that the prosecutor's comments resulted in prejudice.

In sum, the alleged misstatements were, at most, arguably ambiguous as to the response or act of a person of average disposition, but viewed in context with the preceding and subsequent sentences, the prosecutor was commenting on actions or responses taken under the influence of passion rather than judgment. The comments also made up a very minor portion of the prosecutor's argument and, critically, the prosecutor did not make the argument that a person of average disposition would not have killed someone. Tellingly, in her final objection at issue here, which was overruled, counsel stated only, "*Slightly* conflates legal theory." (Italics added.)

---

[11] The prosecutor's closing argument, rebuttal and supplemental argument comprised approximately 130 pages of the transcript while the challenged portion was approximately two pages.

Under these circumstances, defense counsel could have very reasonably determined that an admonition was not required because the prosecutor's comments did not risk confusing the jury or leading it to apply an incorrect standard. Accordingly, we find no error. Furthermore, defendant fails to persuade us that there is a reasonable probability of a more favorable outcome had it not been for counsel's failure to request an admonition. (*Woodruff, supra*, 5 Cal.5th at p. 739; see *Harrington v. Richter* (2011) 562 U.S. 86, 112 ["The likelihood of a different result must be substantial, not just conceivable."].) Therefore, defendant's IAC claim fails.

## DISPOSITION

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


DeSANTOS, J.